# EXHIBIT A

**General Civil and Domestic Relations Case Filing Information Form**

☒ Superior or ☐ State Court of ___Fulton_____ County

| | |
|---|---|
| **For Clerk Use Only** | |
| **Date Filed** _____ | **Case Number** _____ |
| **MM-DD-YYYY** | |

**Plaintiff(s)**
Greenlight Financial Technology, Inc.

**Defendant(s)**
Nichols,  Jordan

| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** Jeffrey L. Mapen          **State Bar Number** 469936          **Self-Represented** ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☒ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐  Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____          _____
**Case Number**                          **Case Number**

☒  I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐  Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____  **Language(s) Required**

☐  Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| GREENLIGHT FINANCIAL TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. _____ |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| JORDAN NICHOLS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**VERIFIED COMPLAINT FOR TEMPORARY**
**RESTRAINING ORDER, INJUNCTIVE RELIEF AND DAMAGES**

Greenlight Financial Technology, Inc., by and through its undersigned counsel, hereby files this Complaint against Jordan Nichols, alleging as follows:

**PARTIES**

1.       Plaintiff, Greenlight Financial Technology, Inc. ("Greenlight") is a Delaware corporation with its principal place of business in Georgia.

2.       Defendant Jordan Nichols ("Nichols") is an individual residing in the state of California at 90 Lincoln Drive, Sausalito, CA 94965.

**JURISDICTION AND VENUE**

3.       This is an action for violations of the Georgia Trade Secrets Act.

4.       Subject matter jurisdiction in this Court is proper.

5.       Personal jurisdiction in this Court is proper under O.C.G.A § 9-10-91.

6.       Venue in this Court is proper, as the tortious acts, omissions, and injuries occurred in Fulton County, Georgia.

## GENERAL ALLEGATIONS

### A.  Greenlight's Business

7.     Greenlight is an innovative financial technology company located in Atlanta, Georgia that has built its business around a smart debit card and mobile application that is marketed to families for the purpose of allowing parents to manage their children's spending and saving and teaching financial responsibility to children.

8.     Among other things, Greenlight's technology allows parents to transfer funds to debit cards for up to five children through the mobile application and allows parents to choose the exact stores where their children can spend, manage children's chores and allowances, set parent-paid interest rates on savings, and more.  Kids can customize their Greenlight cards, track balances, watch their savings grow, gain financial knowledge, learn how to invest in stocks and exchange traded funds (ETFs) and learn to make real world financial decisions.

9.     Because of its unique and proprietary technology and its marketing strategies developed over years and at the cost of millions of dollars, Greenlight has experienced enormous success in the industry, and is the most successful product of its kind currently on the market.

### B.  Greenlight's Relationship with Facebook, Inc. and Nichols

10.     Since its inception, Greenlight has advertised through Facebook, Inc.'s platform to directly market to consumers.

11.     Because of the size of Greenlight's account, in July 2020 Facebook assigned Greenlight a dedicated team of Facebook employees, led by a "Client Partner", to ensure Greenlight's success in its direct to consumer marketing efforts within the Facebook ecosystem. Upon information and belief, Facebook Client Partners – including Greenlight's dedicated Client

2

Partner – are assigned a small number of client accounts to manage, typically between one and six clients.

12.     At all times relevant herein, Defendant Nichols was assigned by Facebook to serve as Greenlight's dedicated Client Partner.

13.     According to publicly available job descriptions, Client Partners must, amongst other responsibilities:

   a. "Define and own account plans to unlock investments and drive client's business key performance metrics";

   b. "Partner with teammates and cross-functional partners to structure and execute operational and strategic initiatives - developing account plans, synthesizing market related data, leading client analysis and defining the overall business approach to Facebook's success with digitally focused businesses";

   c. "Prospect and penetrate organizations to drive alignment and influence executive and day-to-day contacts to execute against account plan";

   d. "Develop performance marketing approaches for client to leverage Facebook ad solutions, creative approaches, and ad tech infrastructure";

   e. "Collaborate with measurement partners to create learning agendas to help clients measure impact of marketing and adopt Facebook measurement solutions";

   f. "Frame client opportunities and challenges to enroll cross-functional support"; and

   g. "Own forecasting and accurate client analysis to support team planning".

   *See* Exhibit A, Client Partner Job Description.

14.     Upon information and belief, in his role as Client Partner at Facebook, Nichols was only tasked with four (4) total accounts, including Greenlight.  Thus, Nichols was heavily involved

3

and played a key role in the development of Greenlight's marketing and business strategies at Facebook.

15.     Consistently, prior to May 28, 2021,[1] Nichols' LinkedIn Profile read that he "led Digital Banking and Personal Finance app partnerships at Facebook" and "had the great fortune of partnering with category creating companies like . . . Greenlight Financial . . . as they developed their product and defined their go to market strategies."

**C. The Mutual Non-Disclosure Agreement**

16.     On November 13, 2020, in order to share confidential and proprietary trade secret information about Greenlight's business with its assigned Client Partner at Facebook, Nichols, Greenlight executed a Mutual Non-Disclosure Agreement with Facebook (the "MNDA"),  a copy of which is attached hereto as Exhibit B.

17.     Under the MNDA, "Confidential Information" is defined as:

[I]nformation related to the Discloser's business, including, without limitation, product designs, product plans, data, software and technology, financial information, marketing plans, business opportunities, proposed terms, pricing information, discounts, inventions and know-how disclosed by Discloser to Recipient, either directly or indirectly, whether in writing, verbally or otherwise, and whether prior to, on or after the Effective Date, that either: (a) is designated as confidential by the Discloser at the time of disclosure; or (b) would reasonably be understood, given the nature of the information or the circumstances surrounding its disclosure, to be confidential.

MNDA, Ex. B, Section 1.

18.     Furthermore, under the MNDA, a party that "receives Confidential Information under this Agreement ("Recipient") may use the Confidential Information only to evaluate whether to enter into a business relationship, or further an existing business relationship, with the party

---

[1] Nichols appears to have deleted the reference to "Greenlight Financial" after receiving Greenlight's Cease and Desist letter on or about May 28, 2021.

4

which discloses Confidential Information under this Agreement ("Discloser")."  MNDA, Ex. B,

Section 2.

19.     As the Recipient, Facebook and its employees (including, but not limited to,

Nichols), are required to:

> (a) hold Confidential Information in strict confidence and take reasonable precautions to protect such Confidential Information (such precautions to include, at a minimum, all precautions Recipient employs with respect to its own confidential materials); (b) not divulge any Confidential Information to any third party (other than to employees or contractors as set forth below); and (c) not copy or reverse engineer any materials disclosed under this Agreement or remove any proprietary markings from any Confidential Information.  Any employee or contractor given access to any Confidential Information must have a legitimate "need to know" such Confidential Information for use specified in Section 2 and Recipient will remain responsible for each such person's compliance with the terms of this Agreement.

MNDA, Ex. B, Section 3.

20.     The term of the MNDA expires five (5) years from the date of receipt of the

Confidential Information, except with respect to any trade secrets where such obligations will be

perpetual.  MNDA, Ex. B, Section 4.

### D. Nichols Becomes Privy to Greenlight Trade Secrets Subject to the Mutual Non-Disclosure Agreement

21.     Between July 2020 and May 17, 2021, Nichols engaged in regular video calls,

Zoom meetings, and occasional telephone calls with employees of Greenlight, including, but not

limited to, Rachel Hamilton (Greenlight's Chief Marketing Officer), Denis Burba (Greenlight

Director of Growth Marketing) and Lee Silver (Greenlight Senior Manager, Growth Marketing)

all of whom are physically based in the Atlanta, Georgia area.

22.     Pursuant to the MNDA, in furtherance of Nichols' role as Client Partner and at the

urging of Facebook to treat Nichols as a strategic partner, after execution of the MNDA, Facebook

5

made certain of Greenlight's extremely sensitive, proprietary and highly confidential trade secrets available for viewing to Nichols in Facebook's self-service platform, and Greenlight expanded upon and shared with Nichols other extremely sensitive, proprietary and highly confidential trade secrets during video calls, Zoom meetings, and telephone calls, including, but not limited to the following (collectively, the "Greenlight Trade Secrets"):

a.   Greenlight's costs to acquire customers ("CAC");

b.   Greenlight's conversion rates;

c.   Greenlight's upgrade rates;

d.   Greenlight's target audiences;

e.   Greenlight's optimization tactics;

f.   Greenlight's creative learnings including winning imagery and copy and value propositions and Greenlight's spend volume and performance over time;

g.   Greenlight's volume and CAC goal, as well as Greenlight's interpretation of performance;

h.   Greenlight's strategic priorities for the marketing team and marketing plans for the year, including in other channels;

i.   Greenlight's product roadmaps;

j.   Greenlight's partnership priorities;

k.   Greenlight's perspective on the competitive landscape, including Step Mobile, Inc. ("Step"), an early-stage financial technology company that is a direct competitor of Greenlight; and

l.   Greenlight's marketing technology stack and performance metrics from other sources.

6

23.     On May 5, 2021, Nichols requested a one-on-one meeting with Greenlight's CMO, Ms. Hamilton,[2] via Zoom.  Nichols' meeting request was atypical, since prior to this meeting, Nichols had only had one prior ad-hoc one-on-one meeting with Ms. Hamilton on September 11, 2020.  Instead, because of Ms. Hamilton's role as Chief Marketing Officer and the size of Greenlight's account at Facebook, Ms. Hamilton's one-on-one calls were typically scheduled on a quarterly basis with Facebook's Vice President, who is three (3) reporting layers up from Nichols.

24.     During the May 5, 2021 meeting, under the guise of discussing Greenlight's recent performance through the Facebook marketing channel, Nichols asked Ms. Hamilton a series of leading questions about Greenlight's business, including, but not limited to, Greenlight's strategic priorities, Greenlight's partnership pipeline and targets, and specifically asked for Ms. Hamilton's point of view on Step and Greenlight's competitive response.  Pursuant to the MNDA, Ms. Hamilton provided responses to Nichols' questions, believing that Nichols was working on solutions to support Greenlight's growth through the Facebook channel.

### E.  Nichols Accepts New Employment with Greenlight's Direct Competitor

25.     Approximately two and a half weeks after Nichols' May 5, 2021 telephone call with Ms. Hamilton, Greenlight learned that Nichols accepted a senior role of "Leading Partnerships" at Step.

26.     Nichols wrote in a May 27, 2021 LinkedIn post that he was recruited by Step Founder and Chief Executive Officer CJ MacDonald, noting that: "I have known CJ MacDonald

---

[2] Ms. Hamilton resides in – and took the Zoom meeting from – a location in Atlanta, Georgia.

for a few years, and when we met, I immediately knew they were doing things differently. **We reconnected a few weeks back the deal was done in days**.” *See* Exhibit C, (emphasis added.)

27.     Step is an early-stage financial technology company in the parent and child sector of the fintech industry that directly competes with Greenlight as a provider of parent-managed payment cards for kids and teens.  Step is self-proclaimed as a “next generation financial services company building the best banking experience to help teens and young adults achieve financial independence and knowledge at an earlier age”, and its main product is a credit card for teens that is associated with a mobile banking app.  *See generally* https://www.step.com/faq.

28.     Upon information and belief, Nichols already disclosed during the recruitment process and/or is presently disclosing Greenlight’s confidential and proprietary trade secret information during the course of his employment at Step.

29.     Furthermore, upon information and belief, Nichols specifically requested the one-on-one meeting with Ms. Hamilton on or about May 5, 2021 for the sole purpose of gathering additional information pertaining to the Greenlight Trade Secrets in order to assist him during the recruitment process and during his new employment with Step.

30.     In his new role at Step, Nichols will interact on a daily basis with Step’s senior leaders and will be jointly accountable for growing Step.

31.     Moreover, in his new role at Step, Nichols has access to and/or will use the Greenlight Trade Secrets to benefit Step and harm Greenlight.

32.     For example, Nichols is privy to the success of Greenlight’s specific product and feature offerings developed over the years and at a cost of millions of dollars, and already has and/or will inform Step’s decision making regarding what products and features to build based on Greenlight’s success.

8

33.     Nichols is also privy to Greenlight's most successful marketing strategies, including Greenlight's creative images, target audiences, ad settings images and messages, and registration flows.  This data and information have been and/or will be used to model Step's marketing strategies and growth.

34.     Nichols is also privy to Greenlight's cost to acquire, conversion rates and upgrade rates.  Such data and information have been and/or will be used to establish pricing with Step's partners and potentially undercut Greenlight pricing terms or proposals.  Understanding these unit economics will enable Nichols and Step to undercut Greenlight in competitive situations wherein the two companies are targeting the same partner.

35.     As another example, Nichols has knowledge pertaining to Greenlight's target audiences, optimization tactics and creative learnings.  Such data and information have been and/or will be used by Nichols and Step to establish credibility and demonstrate expertise that is part of the value provided to partners.  This insight will also directly contribute to the success of Nichols' and Step's joint growth goals with partners.

36.     Nichols also has knowledge of Greenlight's prioritization of partnership opportunities and of partnerships relative to other growth channels.  This data and information has been and/or will inform Nichols' and Step's partnership priorities.

37.     Greenlight's technology is a one-of-a-kind product in the financial technology industry and Greenlight has spent countless hours and millions of dollars developing its product and business model and testing and perfecting its marketing strategies to determine what ultimately worked to reach consumers and to sell its product.

38.     The Greenlight Trade Secrets are all core tenets of Greenlight's business which are extremely confidential and closely guarded by Greenlight.

9

39. Nichols has gathered sufficient information via the Greenlight Trade Secrets from Greenlight to essentially re-create Greenlight's business model and successful marketing efforts at Step, a direct competitor of Greenlight in the parent and child sector of the fintech industry, without any of the expenditure, time or effort that Greenlight expended, which is irreparably harmful to Greenlight.

40. Greenlight sent Nichols a Cease and Desist letter on May 28, 2021, a copy of which is attached hereto as Exhibit D. However, as of the filing of this Verified Complaint, upon information and belief, Nichols continues to be employed by Step.

41. All conditions precedent to bringing this lawsuit have occurred or have been waived.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS UNDER
## GEORGIA TRADE SECRETS ACT

42. Greenlight incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

43. The Greenlight Trade Secrets amount to valuable trade secrets owned by Greenlight.

44. The Greenlight Trade Secrets constitute trade secrets under the GTSA because they include Greenlight's methods, techniques, processes, financial data, financial plans, product plans, and customer information, all of which is not commonly known to the public.

45. Greenlight takes reasonable measures to maintain the secrecy of the Greenlight Trade Secrets by storing such information on a secure, password-protected computer network, and

10

by making them available only to key employees such as executives and employees with a direct need-to-know regarding such information.

46.     Greenlight also requires individuals who become privy to the Greenlight Trade Secrets to first sign a non-disclosure agreement prior to any disclosure of non-public information, and additionally requires employees to execute non-disclosure agreements, confidentiality agreements, and for certain senior executives, restrictive covenant agreements.

47.     In this particular instance, the Greenlight Trade Secrets were only shared with Nichols pursuant to the MNDA with Facebook, in its capacity as Nichols' employer, and at Facebooks' urging to treat Nichols as a strategic business partner.

48.     The Greenlight Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, persons or entities who can obtain economic value from the disclosure or use of the information.

49.     Nichols acquired the Greenlight Trade Secrets while employed by Facebook and while consulting with Greenlight in his capacity as Greenlight's Client Partner, and under a duty to maintain the secrecy of the information and limit the use of the information.

50.     Nichols has improperly disclosed and used, and is continuing to improperly disclose and use, the Greenlight Trade Secrets in connection with his employment at Step, and for the wrongful and deliberate purpose of helping Step unfairly compete against Greenlight.

51.     Such disclosure and use are occurring without the express or implied consent of Greenlight.

52.     Nichols' acquisition, disclosure, and/or use of the Greenlight Trade Secrets amounts to a deliberate and improper misappropriation of the Greenlight Trade Secrets in violation of the GTSA.

11

53.     As a result of Nichols' actual and threatened misappropriation of the Greenlight Trade Secrets, Greenlight is suffering immediate, ongoing, and irreparable harm. Without immediate and permanent injunctive relief, Greenlight will continue to sustain irreparable harm for which there is no adequate remedy at law.

54.     Greenlight is likewise entitled to an award of damages under O.C.G.A. § 10-1-763(a), including damages sustained from Nichols' misappropriation of the Greenlight Trade Secrets, or the actual loss to Greenlight, for the misappropriation.

55.     Nichols' actions have been intentional and were meant to cause harm to Greenlight, entitling Greenlight to recover exemplary damages in an amount not exceeding twice any award made under O.C.G.A. § 10-1-763(b), and to recover attorneys' fees under O.C.G.A. § 10-1-764.

## COUNT II – TEMPORARY RESTRAINING ORDER

56.     Greenlight hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

57.     During his employment at Facebook, Nichols acquired knowledge of the Greenlight Trade Secrets pursuant to the MNDA between Greenlight and Facebook, which constitute valuable trade secrets owned by Greenlight.

58.     Nichols subsequently resigned from his position at Facebook and accepted employment at Step, a direct competitor of Greenlight.

59.     Nichols has improperly disclosed and used, and is continuing to improperly disclose and use, the Greenlight Trade Secrets in connection with his employment at Step, and for the wrongful and deliberate purpose of helping Step unfairly compete against Greenlight.

12

60.     Such disclosure and use are occurring without the express or implied consent of Greenlight.

61.     Upon information and belief, Nichols has and will continue to make unlawful use of the Greenlight Trade Secrets to further the business of Step.

62.     Left unrestrained, Nichols' conduct will cause serious irreparable injury to Greenlight.

63.     Greenlight is without an adequate remedy at law and is subject to irreparable harm and damage absent the exercise of this Court's equitable and legal powers.

64.      Greenlight is entitled to a temporary restraining order to maintain the status quo, enjoining Nichols from using, disclosing and misappropriating Greenlight's confidential and proprietary trade secret information, and which prohibits Nichols from working for Step, Greenlight's direct competitor, or any other direct competitors of Greenlight that provide parent-controlled payment cards and financial management tools for parents and their kids.

## COUNT III - PRELIMINARY AND PERMANENT INJUNCTION

65.     Greenlight hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

66.     Greenlight has a substantial likelihood of success on the merits of its misappropriation of trade secrets claim and will subsequently demonstrate actual success on the merits.

67.     Greenlight will suffer irreparable injury should an injunction fail to issue that prohibits Nichols from using, disclosing and misappropriating Greenlight's confidential and

13

proprietary trade secret information, and which prohibits Nichols from working for Step, Greenlight's direct competitor, or any other direct competitors of Greenlight that provide parent-controlled payment cards and financial management tools for parents and their kids.

68.     The threatened injury to Greenlight outweighs any damage that the proposed injunction may cause Nichols.

69.     The requested injunctive relief will not be adverse to the public interest.

## COUNT IV – ATTORNEY'S FEES

70.     Greenlight hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

71.     Nichols willfully and maliciously misappropriated the Greenlight Trade Secrets, making an award of attorney's fees justified pursuant to O.C.G.A § 10-1-764.

72.     Alternatively, Nichols' actions as set forth in this Verified Complaint have been in bad faith and have caused Greenlight to incur unnecessary trouble and expense.

73.     As a result of Nichols' actions, Greenlight has incurred expenses of litigation, including attorneys' fees, which it is entitled to recover under O.C.G.A. § 13-6-11 in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Greenlight requests that judgment be made and entered in its favor and against Nichols as follows:

A.     Judgment in favor of Greenlight and against Nichols on all of Greenlight's claims;

14

B.      A temporary restraining order, a preliminary injunction pending final adjudication of this matter and a permanent injunction preventing Nichols from using, disclosing and misappropriating the Greenlight Trade Secrets, and which prohibits Nichols from working for Step, Greenlight's direct competitor, or any other direct competitors of Greenlight that provide parent-controlled payment cards and financial management tools for parents and their kids;

C.      An award of Greenlight's costs, expenses, and attorney's fees incurred in connection with bringing and maintaining this action, to the extent permitted by law and equity;

D.      Trial by jury for all claims so triable;

E.      Such further relief as the Court deems appropriate.

Respectfully submitted this 3rd day of June, 2021.

> _/s/ Jeffrey L. Mapen_
> Jeffrey L. Mapen
> Georgia Bar No. 469936
> E-mail:  jeff.mapen@nelsonmullins.com
> Jessica R. Watson
> Georgia Bar No. 760076
> E-mail: jessica.watson@nelsonmullins.com
> _Attorneys for Plaintiff Greenlight Financial Technology, Inc._

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street/ 17th Floor
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

15

## **VERIFICATION**

PERSONALLY appeared before me the undersigned, who being first duly sworn, deposes and says: I am the Chief Marketing Officer of Greenlight Financial Technology, Inc. I have personal knowledge of the allegations of fact made in the foregoing Verified Complaint for Temporary Restraining Order, Injunctive Relief and Damages, and verify that those factual allegations are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3rd, 2021.

Rachel Hamilton
Greenlight Financial Technology, Inc.
Chief Marketing Officer

The foregoing document was acknowledged by me this 3rd day of June, 2021.

Notary Public: Patricia Jones Stanley

My Commission Expires: 8/4/2024



FACEBOOK Careers

# Client Partner

Los Angeles, CA
Austin, TX
Atlanta, GA
Seattle, WA
New York, NY
Detroit, MI
San Francisco, CA
Chicago, IL
- Hide

Apply to Job

! You can submit up to three job applications every 90 days. Be sure to apply for roles that strongly match your skills and work experience.

Facebook is seeking experienced sales and marketing professionals to help build and sell Facebook's advertising solutions to our key partners benefiting from our proven Direct Response and Brand Building Solutions. You'll contribute to a high-caliber team in a business that is experiencing rapid and dramatic growth. We are looking for demonstrated performance in a constantly changing, ambiguous environment, and problem-solving leadership with limited oversight. Ideal candidates will have experience and measurable success in an advertising sales environment and experience selling cross-network online marketing solutions such as integrated sponsorships and display advertising.

## Client Partner Responsibilities

- Define and own account plans to unlock investments and drive client's business key performance metrics

**FACEBOOK** Careers

analysis and defining the overall business approach to Facebook's success with digitally focused businesses

- Prospect and penetrate organizations to drive alignment and influence executive and day-to-day contacts to execute against account plan

- Develop performance marketing approaches for client to leverage Facebook ad solutions, creative approaches, and ad tech infrastructure

- Collaborate with measurement partners to create learning agendas to help clients measure impact of marketing and adopt Facebook measurement solutions

- Frame client opportunities and challenges to enroll cross-functional support

- Own forecasting and accurate client analysis to support team planning

- Create persuasive sales presentations using market trends, case studies and Facebook network solutions

- Exceed sales goals for yourself and your team

- Partner with product teams and all cross-functional teams to act as point of contact and deliver collected and consolidated information that prioritizes customer requests

- Hone in on relevant trends and opportunities in order to craft business cases that support any new requests and/or changes that alter product vision/roadmap

## Minimum Qualifications

- 7+ years of experience in Marketing, Brand Advertising, Media Sales, Customer Acquisition and Growth, Consulting, Mobile and/or Online sales

- 5+ years experience managing client accounts

- 3+ years' experience as proven strategic advisor working with C-Level clients

- Performance marketing experience and/or brand advertising experience

- Track record of reaching and exceeding business targets

- Experience introducing performance measures, processes and systems

**FACEBOOK** Careers

## Locations



## About the Facebook company

Facebook's mission is to give people the power to build community and bring the world closer together. Through our family of apps and services, we're building a different kind of company that connects billions of people around the world, gives them ways to share what matters most to them, and helps bring people closer together. Whether we're creating new products or helping a small business expand its reach, people at Facebook are builders at heart. Our global teams are constantly iterating, solving problems, and working together to empower people around the world to build community and connect in meaningful ways. Together, we can help people build stronger communities — we're just getting started.

Facebook is committed to providing reasonable support (called accommodations) in our recruiting processes for candidates with disabilities, long term conditions, mental health conditions or who are neurodivergent, and to candidates with sincerely held religious beliefs or requiring pregnancy related support. If you need support, please reach out to accommodations-ext@fb.com.

FACEBOOK Careers

## Related Job Openings

### Community & Impact Partnerships Product Marketing Communications Manager
**Facebook | Los Angeles, CA + 7 More**


### Educational Video and Creative Developer
**Facebook | Los Angeles, CA + 6 More**


### Global Head of Marketing, Facebook Business Education
**Facebook | Los Angeles, CA + 6 More**


### Instructional Designer
**Facebook | Los Angeles, CA + 7 More**


### Instructional Designer
**Facebook | Los Angeles, CA + 7 More**


### Marketing Manager, Vertical Solutions
**Facebook | Los Angeles, CA + 6 More**


 View All Related Jobs

---

Facebook is proud to be an Equal Employment Opportunity and Affirmative Action employer. We do not discriminate based upon race, religion, color, national origin, sex (including pregnancy, childbirth, reproductive health decisions, or related medical conditions), sexual orientation, gender identity, gender expression, age, status as a protected veteran, status as an individual with a disability, genetic information, political views or activity, or other applicable legally protected characteristics. You may view our Equal Employment Opportunity notice here. We also consider qualified applicants with

Commercial Card Facebook Careers

**FACEBOOK** Careers

_____|_____|_____|_____ if you wish to access the reporting

links. Additionally, Facebook participates in the E-Verify program in certain locations, as

required by law.

Facebook is committed to providing reasonable accommodations for qualified individuals

with disabilities and disabled veterans in our job application procedures. If you need

assistance or an accommodation due to a disability, you may contact us at

accommodations-ext@fb.com

Upload your resume or share your LinkedIn profile with our recruiting team.

 Get Started

## About Us

Company Info

Newsroom

Careers FAQs

Looking for contractor roles?

## On Social

Facebook

Instagram

LinkedIn

## Our Policies

Candidate Privacy Statement

Data Policy

Cookies

## More Resources

Family Safety Center

Facebook for Business

Facebook for Developers

Facebook © 2021

English (US)

# EXHIBIT B



### FACEBOOK
### MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement ("**Agreement**") is made as of 11/13/2020 (the "**Effective Date**") between Facebook, Inc. and its directly or indirectly wholly-owned subsidiaries ("**Facebook**") on the one hand and the Participant identified below ("**Participant**").

1. **Definition**. "**Confidential Information**" means information relating to the Discloser's business, including, without limitation, product designs, product plans, data, software and technology, financial information, marketing plans, business opportunities, proposed terms, pricing information, discounts, inventions and know-how disclosed by Discloser to Recipient, either directly or indirectly, whether in writing, verbally or otherwise, and whether prior to, on or after the Effective Date, that either: (a) is designated as confidential by the Discloser at the time of disclosure; or (b) would reasonably be understood, given the nature of the information or the circumstances surrounding its disclosure, to be confidential. Confidential Information also includes the existence of this Agreement and the fact or nature of the discussions between the parties.

2. **Use of Confidential Information**. A party which receives Confidential Information under this Agreement ("**Recipient**") may use the Confidential Information only to evaluate whether to enter into a business relationship, or further an existing business relationship, with the party which discloses Confidential Information under this Agreement ("**Discloser**").

3. **Disclosure of Confidential Information.** Recipient will: (a) hold Confidential Information in strict confidence and take reasonable precautions to protect such Confidential Information (such precautions to include, at a minimum, all precautions Recipient employs with respect to its own confidential materials); (b) not divulge any Confidential Information to any third party (other than to employees or contractors as set forth below); and (c) not copy or reverse engineer any materials disclosed under this Agreement or remove any proprietary markings from any Confidential Information. Any employee or contractor given access to any Confidential Information must have a legitimate "need to know" such Confidential Information for use specified in Section 2 and Recipient will remain responsible for each such person's compliance with the terms of this Agreement.

4. **Term; Confidentiality Period**.  Either party may terminate this Agreement upon 30 days prior written notice to the other party. Irrespective of any termination or expiration of this Agreement, Recipient's obligations with respect to Confidential Information under this Agreement expire 5 years from the date of receipt of the Confidential Information (except with respect to any trade secrets where such obligations will be perpetual).



NDA-T00070642



**ACKNOWLEDGED AND AGREED ON BEHALF OF:**

**Facebook**

Signature: _David Settles (signature)_

Name:   David Settles

Title:   Director and Associate General Counsel, Commercial

Address:   1 Hacker Way; Menlo Park, California 94025

**Participant: Greenlight Financial Technology, Inc**

Signature: _Rachel Hamilton (signature)_
Rachel Hamilton (Nov 17, 2020 20:11 EST)

Name:   Rachel Hamilton

Title:   CMO

Email:   rachel@greenlight.me

Address:   303 Peachtree St NE Suite 4300 Atlanta, GA 30308 United States, United States

   NDA-T00070642



**Jordan Nichols** liked **Ryan Murray-Lopez**'s comment on this      •••

**Jordan Nichols** • 3rd+
Partnerships at Step | Ex: Facebook & Stripe
5d • Edited • 🌐

There is no way I could hold this in any longer. I am elated to be joining Step!

We are building the bank for Gen Z and empowering a more financially literate future... and having some fun while we do it.

I have known CJ MacDonald for a few years, and when we met I immediately knew they were doing things differently. We reconnected a few weeks back the deal was done in days.

We do not know what the future holds, but we can be sure Gen Z will have a different relationship with money than any of us had. Step has a chance to be a critical and central part of that.

I have been fortunate over the past few years during my role at Facebook to work with almost all of the category leaders in personal finance disruption. I can tell you that Step is developing a rare connection with their customers that I have only seen a couple of times, and those companies are now household names.

The mission. The product. The customer excitement. I am pinching myself to be a part of it.

Add to that, Stripe, Coatue Management, General Catalyst, Charlie D'Amelio (google her if you're old like me) , Steph Curry, Justin Timberlake and Will Smith backing us... we can do something special.

Oh yea. We are hiring!

#NextWave!

https://lnkd.in/dBgP5WS

# Step raises $100 million in Series C funding & surpasses 1.5 million users after less than six months in market

Led by General Catalyst, the round includes several existing Silicon Valley investors alongside serial angel investor Jared Leto; also announces Stephen Curry as an early investor in the company.

**April 27, 2021**







**NELSON MULLINS RILEY & SCARBOROUGH LLP**
ATTORNEYS AND COUNSELORS AT LAW

Jeff Mapen
(404) 322-6157
jeff.mapen@nelsonmullins.com

201 17th Street NW, Suite 1700
Atlanta, GA 30363
T 404.322.6000  F 404.322.6050
nelsonmullins.com

May 28, 2021

**VIA E-MAIL and FedEx**
Mr. Jordan Nichols
90 Lincoln Drive
Sausalito, CA 94965
E-Mail: Jordan.nichols44@gmail.com

> RE:   *Demand to Immediately Cease and Desist by Greenlight Financial Technology, Inc.*

Dear Mr. Nichols:

I am an attorney for Greenlight Financial Technology, Inc. ("Greenlight").  Greenlight hereby demands that you immediately cease and desist from sharing or otherwise using any Greenlight trade secret information with Step Mobile, Inc. ("Step").

As you know, during your employment with Facebook, Inc. ("Facebook"), you served from July 2020 through the present as Greenlight's "Client Partner".  In your role as Client Partner, you were tasked by Facebook to ensure Greenlight's success in its direct to consumer marketing efforts within the Facebook ecosystem.  To aid in those efforts, you requested and Greenlight shared extremely sensitive proprietary and confidential information with you pursuant to a Mutual Non-Disclosure Agreement ("MNDA"), executed between Greenlight and Facebook.  Pursuant to the MNDA, in furtherance of your role as Client Partner and at the urging of Facebook, Greenlight shared with you, among other things, the following highly proprietary Greenlight trade secrets (collectively, the "Greenlight Trade Secrets"):

- Costs to acquire customers ("CAC");
- Conversion rates;
- Upgrade rates;
- Target audiences;
- Optimization tactics;
- Creative learnings including winning imagery and value propositions; and
- Spend volume and performance over time.

CALIFORNIA | COLORADO | DISTRICT OF COLUMBIA | FLORIDA | GEORGIA | MARYLAND | MASSACHUSETTS | NEW YORK
NORTH CAROLINA | SOUTH CAROLINA | TENNESSEE | WEST VIRGINIA

In addition, at the urging of Facebook to treat you as a strategic partner,[1] Greenlight shared the following highly proprietary Greenlight Trade Secrets pursuant to the MNDA:

- Volume and CAC goals (including Greenlight's interpretation of performance);
- Strategic priorities for the marketing team and marketing plans for the year, including in other channels;
- Product roadmaps;
- Partnership priorities;
- Perspective on competitive threats, including Step; and
- Martech stack and performance metrics from other sources.

Earlier this week, Greenlight first learned that you were leaving Facebook and taking on the role of "Leading Partnerships" at Step. According to currently available information, you were recruited by Step's CEO for such a senior role at Step, where you will interact on a daily basis with Step's senior leaders and be jointly accountable for growing Step. In such a senior role, you have access to and/or will use the Greenlight Trade Secrets to benefit Step and harm Greenlight. Among other things, you have access to and/or will use and disclose the Greenlight Trade Secrets the following ways in your employment at Step:

- Your knowledge of Greenlight's cost to acquire, conversion rates and upgrade rates have been and/or will be used to establish pricing with Step's partners and potentially undercut Greenlight pricing terms or proposals. Understanding these unit economics will enable you and Step to undercut Greenlight in competitive situations wherein the two companies are targeting the same partner;
- Your knowledge of Greenlight's target audiences, optimization tactics and creative learnings have been and/or will be used by you and Step to establish credibility and demonstrate expertise that is part of the value provided to partners. This insight will also directly contribute to the success of your and Step's joint growth goals with partners; and
- Your knowledge of Greenlight's prioritization of partnership opportunities and of partnerships relative to other growth channels, have been and/or will inform your and Step's partnership priorities as well as performance of your and Step's growth channels.

These are just a few of the many examples of how you have misappropriated and will misappropriate Greenlight's Trade Secrets in your employment at Step and likely during the recruitment as well. Troublingly, on May 5, 2021, at your request you engaged in a one-on-one meeting with Greenlight's Chief Marketing Officer, Rachel Hamilton, under the guise of your Client Partner role with Facebook. During that atypical meeting, you and Ms. Hamilton discussed, among other things, Greenlight's strategic priorities, Greenlight's partnership pipeline and targets and Ms. Hamilton's point of view on Step and Greenlight's competitive response. According to

---

[1] Underscoring the amount of time you dedicated to Greenlight and the amount of access given to you by Greenlight at the urging of Facebook, Greenlight understands that you were tasked with only approximately four total accounts, including Greenlight, in your role at Facebook. Indeed, you wrote in your Linkedin profile that you "had the great fortune of partnering with category creating companies like… Greenlight Financial… as they developed their product and defined their go to market strategies."

your Linkedin posting on May 27, you apparently "reconnected" with Step "a few weeks back" and were hired "in days." In other words, while under an MNDA and using your role at Facebook to improperly gain access, you apparently mined Greenlight's CMO for additional Greenlight Trade Secrets that you could use and/or have already used in your interview with Step and in your employment with Step.

Greenlight hereby demands that you immediately cease and desist from misappropriating the Greenlight Trade Secrets and violating the terms of the MNDA. Given the Greenlight Trade Secrets that were shared with you during your time at Facebook under an MNDA that directly align with your new role at Step, you have and will continue to violate the MNDA and misappropriate Greenlight's Trade Secrets if you accept employment with Step. Greenlight is being severely harmed by your actions and by the actions of Step.

Greenlight hereby reserves any and all rights and remedies under applicable law and contract against you and against Step. To the extent you or your counsel have any questions concerning the foregoing, I am available to discuss. To the extent you do not abide by the terms of this cease and desist, Greenlight intends to enforce its rights in a court of law against you and against Step.

Very truly yours,

Jeffrey L. Mapen

JLM/pjs
cc:    Brad Fauss, Esq. (*via E-Mail*)
       Michelle Johnson, Esq. (*via E-Mail*)
       Kevin Leblang, Esq. (*via E-Mail*)
       Step Mobile, Inc. (*via FedEx*; c/o CJ Macdonald, Agent for Service of Process, 120 Hawthorne Avenue, Palo Alto, CA 94301)

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

**136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303**

**SUMMONS**

GREENLIGHT FINANCIAL TECHNOLOGY, INC.                           ) Case
                                                                                    ) No.:_____
                                                                                    )
_____                                                   )
                                                                                    )
**Plaintiff,**                                                                           )
                                                                                    )
   **vs.**                                                                  )
                                                                                    )
JORDAN NICHOLS                                                                           )
_____                                                   )
                                                                                    )
_____                                                   )
**Defendant**                                                                            )
                                                                                    )
                                                                                    )
                                                                                    )
                                                                                    )

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at
https://efilega.tylerhost.net/ofsweb (unless you are exempt from filing electronically) and serve upon
plaintiff's attorney, whose name and address is:

    Jeffrey L. Mapen
    Jessica R. Watson
    Nelson Mullins Riley & Scarborough LLP
    201 17th Street, 17th Floor
    Atlanta, Georgia 30363
    jeff.mapen@nelsonmullins.com
    jessica.watson@nelsonmullins.com

An answer to the complaint which is herewith served upon you, within 30 days after service of this
summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed
within five (5) business days of such service. Then time to answer shall not commence until such proof of
service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This_____day of_____, 20 _____

                                       Honorable Cathelene "Tina" Robinson
                                       Clerk of Superior Court
                                       By_____
                                                 Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you     _____, 20_____

                                               Deputy Sherriff

**Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used**

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| GREENLIGHT FINANCIAL | ) | |
| TECHNOLOGY, INC., | ) | |
| | ) | Civil Action File No.: |
|     Plaintiff, | ) | 2021CV350274 |
| | ) | |
| v. | ) | Judge Kelly Lee Ellerbe |
| | ) | |
| JORDAN NICHOLS, | ) | |
| | ) | |
|     Defendant. | ) | |

## **RULE NISI**

This matter is set for a hearing on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction on **Wednesday, June 9, 2021 at 2:00 p.m.** The Court will hear this matter via videoconference[1] and will email the parties the Zoom information.

This 7th day of June, 2021.

      /S/ Jennifer Ventry

Jennifer Ventry
Staff Attorney to Judge Kelly Lee Ellerbe
Superior Court of Fulton County
jennifer.ventry@fultoncountyga.gov

**Service via eFileGA.**

---

[1] The Court uses Zoom (https://zoom.us/) which is available for free.

**IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA**

| | | |
|---|---|---|
| GREENLIGHT FINANCIAL TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 2021CV350274 |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| JORDAN NICHOLS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S MOTION AND MEMORANDUM OF LAW FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Greenlight Financial Technology, Inc. ("Greenlight") respectfully moves this Court for a temporary restraining order and a preliminary injunction. Defendant Jordan Nichols ("Nichols" or "Defendant") should be restrained from engaging in specific actions described below to prevent irreparable harm and preserve the status quo pending the litigation of this action.

## **INTRODUCTION**

Nichols obtained certain of Greenlight's confidential and proprietary trade secrets, subject to a mutual non-disclosure agreement.  Nichols has now used and/or will use those trade secrets, without Greenlight's permission, in his new senior role working for Step Mobile, Inc. ("Step"), a direct competitor of Greenlight whose central product is also a parent-managed payment card for kids and teens.  This Motion seeks to prevent Nichols from further misappropriating Greenlight's trade secrets.

Since its inception, Greenlight has advertised through Facebook Inc.'s ("Facebook") platform to directly market to consumers. Until late May 2021, Nichols was employed by

Facebook as Greenlight's dedicated "Client Partner" and was tasked by Facebook to ensure Greenlight's success in its marketing efforts on the Facebook platform.  To facilitate Greenlight's success, Facebook provided Nichols with access to Greenlight's confidential and proprietary trade secret information through Facebook's self-service platform, and Greenlight expounded upon and shared more of its confidential and proprietary trade secret information with Nichols over the course of numerous video calls and Zoom meetings, all subject to a Mutual Non-Disclosure Agreement ("MNDA") executed between Facebook and Greenlight.

After requesting and having an atypical meeting with Rachel Hamilton, Greenlight's Chief Marketing Officer, on May 5, 2021, under the guise of discussing Greenlight's recent performance through the Facebook marketing channel, and asking Ms. Hamilton a series of leading questions about Greenlight's business, including, but not limited to, Greenlight's strategic priorities, Greenlight's partnership pipeline and targets, and Ms. Hamilton's point of view on Step and Greenlight's competitive response, Nichols resigned from Facebook a mere two weeks later to take a new senior role, "Leading Partnerships" at Step.

By way of just one example to illustrate how Nichols has misappropriated and will continue to misappropriate Greenlight's trade secrets, in his new role at Step, Nichols will be tasked with determining which audiences Step should target and how to target them. Using Greenlight's confidential and proprietary trade secret information, which was disclosed to Nichols pursuant to an MNDA and in furtherance of his role as Greenlight's Client Partner at Facebook, Nichols will be able to save Step the years of effort and millions of dollars expended by Greenlight and allow Step to copy the exact same audiences Greenlight targets in the same manner that Greenlight targets them.

Nichols grossly abused his position to gather confidential and proprietary trade secret information from Greenlight and is using and will continue to use Greenlight's confidential and proprietary trade secret information in his new role at Step, irreparably harming Greenlight. For these reasons, Greenlight respectfully seeks a temporary restraining order and a preliminary injunction against Nichols.

## STATEMENT OF FACTS

### A.  Greenlight's Business.

Greenlight is an innovative financial technology company located in Atlanta, Georgia that has built its business around a smart debit card and mobile application that is marketed to families for the purpose of allowing parents to manage their children's spending and saving and teaching financial responsibility to children.  (*See* Verified Complaint, ¶ 7).  Among other things, Greenlight's technology allows parents to transfer funds to debit cards for up to five children through the mobile application and allows parents to choose the exact stores where their children can spend, manage children's chores and allowances, set parent-paid interest rates on savings, and more.  (*See Id.*, ¶ 8).  Kids can customize their Greenlight cards, track balances, watch their savings grow, gain financial knowledge, learn how to invest in stocks and exchange traded funds (ETFs) and learn to make real world financial decisions. (*See Id.*, ¶ 8).  Because of its unique and proprietary technology, Greenlight has experienced enormous success in the industry, and is the most successful product of its kind currently on the market.  (*See Id.*, ¶ 9).

### B.  Greenlight's Relationship with Facebook and Nichols.

Since its inception, Greenlight has advertised through Facebook's platform to directly market to consumers.  (*See Id.*, ¶ 10).  Because of the size of Greenlight's account, in July 2020 Facebook assigned Greenlight a dedicated team of Facebook employees, led by a "Client Partner," to ensure Greenlight's success in its direct to consumer marketing efforts within the Facebook

ecosystem. (*See Id.*, ¶ 11). Upon information and belief, Facebook Client Partners – including Greenlight's dedicated Client Partner – are assigned a small number of client accounts to manage, typically between one and six clients. (*See Id.*, ¶ 11).

At all times relevant to this lawsuit, Defendant Nichols was assigned by Facebook to serve as Greenlight's dedicated Client Partner. (*See Id.*, ¶ 12). According to publicly available job descriptions, Client Partners must, among other responsibilities:

  a. "Define and own account plans to unlock investments and drive client's business key performance metrics";

  b. "Partner with teammates and cross-functional partners to structure and execute operational and strategic initiatives - developing account plans, synthesizing market related data, leading client analysis and defining the overall business approach to Facebook's success with digitally focused businesses";

  c. "Prospect and penetrate organizations to drive alignment and influence executive and day-to-day contacts to execute against account plan";

  d. "Develop performance marketing approaches for client to leverage Facebook ad solutions, creative approaches, and ad tech infrastructure";

  e. "Collaborate with measurement partners to create learning agendas to help clients measure impact of marketing and adopt Facebook measurement solutions";

  f. "Frame client opportunities and challenges to enroll cross-functional support"; and

  g. "Own forecasting and accurate client analysis to support team planning".

(*See Id.*, ¶ 13, Ex. A).

Upon information and belief, in his role as Client Partner at Facebook, Nichols was only tasked with four (4) total accounts, including Greenlight. (*See Id.*, ¶ 14). Thus, Nichols was heavily involved and played a key role in the development of Greenlight's marketing and business strategies at Facebook. (*See Id.*, ¶ 14). Consistently, prior to May 28, 2021,[1] Nichols' LinkedIn Profile read that he "led Digital Banking and Personal Finance app partnerships at Facebook" and

---

[1] Nichols appears to have deleted the reference to "Greenlight Financial" after receiving Greenlight's Cease and Desist letter on or about May 28, 2021.

"had the great fortune of partnering with category creating companies like . . . Greenlight Financial . . . as they developed their product and defined their go to market strategies." (*See Id.*, ¶ 15).

### C. The Mutual Non-Disclosure Agreement.

On November 13, 2020, in order to share confidential and proprietary trade secret information about Greenlight's business with its assigned Client Partner at Facebook, Nichols, Greenlight executed a Mutual Non-Disclosure Agreement with Facebook (the "MNDA"). (*See Id.*, ¶ 16, Ex. B). Under the MNDA, "Confidential Information" is defined as:

> [I]nformation related to the Discloser's business, including, without limitation, product designs, product plans, data, software and technology, financial information, marketing plans, business opportunities, proposed terms, pricing information, discounts, inventions and know-how disclosed by Discloser to Recipient, either directly or indirectly, whether in writing, verbally or otherwise, and whether prior to, on or after the Effective Date, that either: (a) is designated as confidential by the Discloser at the time of disclosure; or (b) would reasonably be understood, given the nature of the information or the circumstances surrounding its disclosure, to be confidential.

(*See Id.*, ¶ 17, Ex. B).

Furthermore, under the MNDA, a party that "receives Confidential Information under this Agreement ("Recipient") may use the Confidential Information only to evaluate whether to enter into a business relationship, or further an existing business relationship, with the party which discloses Confidential Information under this Agreement ("Discloser")." (*See Id.*, ¶ 18, Ex. B).

As the Recipient, Facebook and its employees (including, but not limited to, Nichols), are required to:

> (a) hold Confidential Information in strict confidence and take reasonable precautions to protect such Confidential Information (such precautions to include, at a minimum, all precautions Recipient employs with respect to its own confidential materials); (b) not divulge any Confidential Information to any third party (other than to employees or contractors as set forth below); and (c) not copy or reverse engineer any materials disclosed under this Agreement or remove any proprietary markings from any Confidential Information. Any employee or contractor given access to any Confidential Information must have a legitimate "need to know" such Confidential Information for use specified in Section 2 and

Recipient will remain responsible for each such person's compliance with the terms
of this Agreement.

(*See Id.*, ¶ 19, Ex. B).

The term of the MNDA expires five (5) years from the date of receipt of the Confidential

Information, except with respect to any trade secrets where such obligations will be perpetual.

(*See Id.*, ¶ 20).

### D.   Nichols Becomes Privy to Greenlight Trade Secrets Subject to the Mutual Non-Disclosure Agreement.

Between July 2020 and May 17, 2021, Nichols engaged in regular video calls, Zoom

meetings, and occasional telephone calls with employees of Greenlight, including, but not limited

to, Rachel Hamilton (Greenlight's Chief Marketing Officer), Denis Burba (Greenlight's Director

of Growth Marketing) and Lee Silver (Greenlight's Senior Manager, Growth Marketing) all of

whom are physically based in the Atlanta, Georgia area.  (*See Id.*, ¶ 21).  Pursuant to the MNDA,

in furtherance of Nichols' role as Client Partner and at the urging of Facebook to treat Nichols as

a strategic partner, after execution of the MNDA, Facebook made certain of Greenlight's

extremely sensitive, proprietary and highly confidential trade secrets available for viewing to

Nichols in Facebook's self-service platform, and Greenlight expanded upon and shared with

Nichols other extremely sensitive, proprietary and highly confidential trade secrets during video

calls, Zoom meetings, and telephone calls, including, but not limited to the following (collectively,

the "Greenlight Trade Secrets"):

        a.   Greenlight's costs to acquire customers ("CAC");
        b.   Greenlight's conversion rates;
        c.   Greenlight's upgrade rates;
        d.   Greenlight's target audiences;
        e.   Greenlight's optimization tactics;
        f.   Greenlight's creative learnings including winning imagery and copy and value
           propositions and Greenlight's spend volume and performance over time;

g.  Greenlight's volume and CAC goal, as well as Greenlight's interpretation of performance;

h.  Greenlight's strategic priorities for the marketing team and marketing plans for the year, including in other channels;

i.  Greenlight's product roadmaps;

j.  Greenlight's partnership priorities;

k.  Greenlight's perspective on the competitive landscape, including Step, an early-stage financial technology company that is a direct competitor of Greenlight; and

l.  Greenlight's marketing technology stack and performance metrics from other sources.

(*See Id.*, ¶ 22).

On May 5, 2021, Nichols requested a one-on-one meeting with Ms. Hamilton,[2] via Zoom. (*See Id.*, ¶ 23). Nichols' meeting request was atypical, since prior to this meeting, Nichols had only had one prior ad-hoc one-on-one meeting with Ms. Hamilton on September 11, 2020.  (*See Id.*, ¶ 23).   Instead, because of Ms. Hamilton's role as Chief Marketing Officer and the size of Greenlight's account at Facebook, Ms. Hamilton's one-on-one calls were typically scheduled on a quarterly basis with Facebook's Vice President, who is three (3) reporting layers up from Nichols.   (*See Id.*, ¶ 23).

During the May 5, 2021 meeting, under the guise of discussing Greenlight's recent performance through the Facebook marketing channel, Nichols asked Ms. Hamilton a series of leading questions about Greenlight's business, including, but not limited to, Greenlight's strategic priorities, Greenlight's partnership pipeline and targets, and specifically asked for Ms. Hamilton's point of view on Step and Greenlight's competitive response.  (*See Id.*, ¶ 24). Step is an early-stage financial technology company that directly competes with Greenlight, and is self-proclaimed as a "next generation financial services company building the best banking experience to help teens and young adults achieve financial independence and knowledge at an earlier age," with its main

---

[2] Ms. Hamilton resides in – and took the Zoom meeting from – a location in Atlanta, Georgia.

product being a secured credit card for teens that is associated with a mobile banking app.  (*See Id.*, ¶ 27; *See generally* https://www.step.com/faq). Pursuant to the MNDA, Ms. Hamilton provided responses to Nichols' questions, believing that Nichols was working on solutions to support Greenlight's growth through the Facebook channel.  (*See* Verified Complaint, ¶ 24).

### E.  <u>Nichols Accepts New Employment with Greenlight's Direct Competitor.</u>

Approximately two and a half weeks after Nichols' May 5, 2021 telephone call with Ms. Hamilton, Greenlight learned that Nichols accepted a senior role of "Leading Partnerships" at Step. (*See Id.*, ¶ 25).  Nichols wrote in a May 27, 2021 LinkedIn post that he was recruited by Step Founder and Chief Executive Officer, CJ MacDonald, noting that: "I have known CJ MacDonald for a few years, and when we met I immediately knew they were doing things differently. **We reconnected a few weeks back the deal was done in days**."  (*See Id.*, ¶ 26).

It is Greenlight's reasonable belief that Nichols already disclosed during the recruitment process and/or is presently disclosing Greenlight's confidential and proprietary trade secret information during the course of his employment at Step.  (*See Id.*, ¶ 28). Furthermore, it is apparent that Nichols specifically requested the one-on-one meeting with Ms. Hamilton on or about May 5, 2021 for the sole purpose of gathering additional information pertaining to the Greenlight Trade Secrets in order to assist him during the recruitment process and during his new employment with Step.  (*See Id.*, ¶ 29).

In his new role at Step, Nichols will interact on a daily basis with Step's senior leaders and will be jointly accountable for growing Step.  (*See Id.*, ¶ 30). Moreover, in his new role at Step, Nichols has access to and/or will use the Greenlight Trade Secrets to benefit Step and harm Greenlight.  (*See Id.*, ¶ 31).  For example, Nichols is privy to the success of Greenlight's specific product and feature offerings developed over the years and at a cost of millions of dollars, and

already has and/or will inform Step's decision making regarding what products and features to build based on Greenlight's success. (*See Id.*, ¶ 32).  Nichols is also privy to Greenlight's most successful marketing strategies, including Greenlight's creative images, target audiences, ad settings images and messages, and registration flows.  (*See Id.*, ¶ 33).  This data and information have been and/or will be used to model Step's marketing strategies and growth.  (*See Id.*).  As another example, Nichols has knowledge pertaining to Greenlight's target audiences, optimization tactics and creative learnings.  (*See Id.*, ¶ 34). Such data and information have been and/or will be used by Nichols and Step to establish credibility and demonstrate expertise that is part of the value provided to partners.  (*See Id.*). This insight will also directly contribute to the success of Nichols' and Step's joint growth goals with partners. (*See Id.*). Nichols also has knowledge of Greenlight's prioritization of partnership opportunities and of partnerships relative to other growth channels. (*See Id.*, ¶ 36). This data and information have been and/or will inform Nichols' and Step's partnership priorities. (*See Id.*).

Because Step is a direct competitor of Greenlight with a central focus of providing a product that is substantially similar to Greenlight's product, Greenlight believes that Nichols is disclosing and/or will disclose Greenlight's confidential and proprietary trade secret information during the course of his employment at Step.  Nichols gathered substantial trade secret information regarding Greenlight and its processes as Greenlight's Client Partner at Facebook, pursuant to the MNDA, and intentionally gathered additional trade secret information near the end of his employment at Facebook for his own deceptive use in acquiring employment with Step and for his use in his new senior position at Step.  As such, Greenlight requests a temporary restraining order and a preliminary injunction order to enjoin Defendant's unlawful conduct and prevent irreparable harm to Greenlight.

## ARGUMENT

Nichols' actions necessitate a temporary restraining order and a preliminary injunction. Greenlight has a valid claim for misappropriation of trade secrets under the Georgia Trade Secrets Act, but in the meantime, while those claims are being litigated, Nichols could inflict irreparable harm on Greenlight by using and disclosing the Greenlight Trade Secrets. Therefore, Greenlight seeks a temporary restraining order and preliminary injunction.

A. **A temporary restraining order should be granted because Nichols has used and/or will use the Greenlight Trade Secrets in conjunction with his senior position at Step, and immediate and irreparable injury will occur to Greenlight.**

Equity permits injunctive relief to prevent threatened or existing torts and any other action that is "contrary to equity and good conscience and for which no adequate remedy is provided at law." O.C.G.A. § 9-5-1. In this case, Greenlight has given notice of this filing,[3] but even without notice, a temporary restraining order is permitted when the verified complaint shows that "immediate and irreparable injury" will occur before the opposing party can be heard. O.C.G.A. § 9-11-65(b)(1). For example, trial courts have granted temporary restraining orders to protect the assets of a company that were being mismanaged with its property going to waste (*Stuard Lumber Co. v. Taylor*, 150 Ga. 135 (1920)) and to enjoin the sale of property to prevent the disposition of assets (*Ebon Foundation v. Oatman*, 269 Ga. 340, 341 (1998); *Rogers v. Robertson*, 222 Ga. 519, 519 (1966)).

In this case, as detailed above and in the Verified Complaint, Nichols gathered substantial confidential and proprietary trade secret information pertaining to Greenlight's business. For

---

[3] See attached E-Mail sent on June 3, 2021 to Mr. Nichols' last known email address advising him of the lawsuit and requesting that he or his counsel respond. *See* Exhibit A hereto. Plaintiff is working to perfect service of the Summons and Verified Complaint. Undersigned counsel will also provide to Mr. Nichols via E-Mail a copy of this Motion contemporaneous with its filing.

example, Nichols is intimately privy to, among other things, the success of Greenlight's specific product and feature offerings; Greenlight's most successful marketing strategies, including Greenlight's creative images, target audiences, ad settings images and messages, and registration flows; Greenlight's target audiences, optimization tactics and creative learnings; and Greenlight's prioritization of partnership opportunities and of partnerships relative to other growth channels. (*See Id.*, ¶¶ 32-36).

During Nichols' employment at Step, he will be tasked with responsibilities that will directly call on his knowledge of the Greenlight Trade Secrets.  For example:

- Nichols will be tasked with forming strategic alliances with other brands. He will use his knowledge of which brands Greenlight is talking to and believes are critical partners to pursue alliances for Step instead. He will pursue exclusive relationships to block Greenlight and will use his knowledge of Greenlight's business to offer competitive deal terms to potential partners.

- Nichols will be tasked with supporting Marketing leaders to grow Step's user base. Step will replicate the combination of target audience creation, optimization method, landing destinations, creative asset types, value proposition and messaging styles that Greenlight has used to introduce millions of families to Greenlight. Because there are dozens or hundreds of selections underlying this setup, there are essentially infinite combinations to try, and Greenlight has spent years and millions of dollars to find which are effective for growing its user base.

- Nichols will be tasked with supporting Product leaders to determine how to use limited product development and engineering resources to grow Step's user base and compete with Greenlight's product offering. Step will use Nichols' knowledge of which features are most popular and strategic for Greenlight, including precise knowledge of upgrade rates for Greenlight's premium products, to determine which Greenlight features they should move quickly to copy.

Particularly because of Nichols' May 5, 2021 call with Ms. Hamilton during which he intentionally fished for additional information regarding the Greenlight Trade Secrets under the false guise of addressing Greenlight's performance at Facebook, it is Greenlight's reasonable belief that Nichols already disclosed during the recruitment process and/or is presently disclosing

Greenlight's confidential and proprietary trade secret information during the course of his employment at Step, including, but not limited to, the above examples. (*See Id.*, ¶¶ 23-24; 28).

Greenlight faces immeasurable, irreparable harm from Nichols' egregious actions. Nichols cannot be allowed to continue on this unlawful path. Nichols has shown no concern for the irreparable damage he is inflicting upon Greenlight. Therefore, a temporary restraining order should be granted to prevent Nichols from continuing to use in any manner, or otherwise disclose, any of the Greenlight Trade Secrets in Nichols' possession, custody, or control, and prohibiting Nichols from working for Step or any other direct competitor of Greenlight that provides parent-managed payment cards for kids and teens.

**B.      An interlocutory injunction should also be granted because Greenlight will suffer injuries for which there is no adequate remedy at law if Nichols is permitted to continue to use and disclose the Greenlight Trade Secrets and work for Greenlight's direct competitor during this litigation.**

Georgia courts are empowered to grant preliminary injunctions. O.C.G.A. § 9-11-65. The decision to grant or deny a request for injunctive relief "rest[s] in the sound discretion of the judge, according to the circumstances of each case." O.C.G.A. § 9-5-8. A trial court may grant a preliminary injunction "to maintain the status quo until a final hearing if, by balancing the relative equities of the parties, it would appear that the equities favor the party seeking the injunction." *Outdoor Advertising Ass'n of Ga., Inc. v. Garden Club of Ga., Inc.*, 272 Ga. 146, 147 (2000); *see also Kinard v. Ryman Farm Homeowners' Ass'n, Inc.*, 278 Ga. 149, 149 (2004) (noting the "purpose for granting interlocutory injunctions is to preserve the status quo as well as balance the conveniences of the parties pending a final adjudication of the case.").

When a trial court considers an application for an interlocutory injunction pending a final judgment, the court should look to these four factors:

(1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party

outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of his claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.

*Green Bull Georgia Partners, LLC v. Register*, 301 Ga. 472, 475, 801 S.E.2d 843, 846 (2017).

1. ***An interlocutory injunction should be issued because Greenlight has shown that it is threatened with irreparable injury if no injunction issues.***

For the same reasons that a temporary restraining order should issue, so too should an interlocutory injunction issue.  If Nichols is permitted to continue to use and disclose the Greenlight Trade Secrets in his employment with Step, more harm will come to Greenlight. Greenlight has spent years developing its product and business model, including testing various marketing strategies and determining what works best for Greenlight's product.  (Verified Complaint, ¶ 37).   In his role as Client Partner, Nichols became privy to the Greenlight Trade Secrets subject to the MNDA, and acquired sufficient information from Greenlight to essentially re-create Greenlight's business model and successful marketing efforts for Step, a direct competitor of Greenlight, without any of the expenditure, time or effort that Greenlight expended, which is irreparably harmful to Greenlight.  (*See Id.*, ¶ 39).   This immediate and irreparable harm justifies injunctive relief in favor of Greenlight.

2. ***A balancing of the equities of the parties weighs in favor of Greenlight.***

The threat of continuing irreparable injury to Greenlight clearly outweighs any speculative harm that injunctive relief might cause Nichols. Specifically, Nichols cannot show that undue hardship will result if he is restrained from working for Step and from using non-public information that was misappropriated from Greenlight, which will irreparably harm Greenlight's business when disclosed to Nichols' new employer, a direct competitor of Greenlight.

Nichols has a master's degree in Business Administration from the University of Michigan (2014).   His work with Facebook centered on Facebook's Digital Banking and Personal Finance application partnerships at Facebook on the Digital Disruptors team.   His prior work includes employers such as Stripe (payment platform), Euclid (data platform for tracking identities and behavior of individuals), and Leaf (offering employers 529 savings plans).[4]   His skills are transferable to a comparable position with countless other companies, including those within the data and/or financial technology industry with an employer that is not a provider of parent-managed payment cards for kids and teens.   Moreover, Nichols will suffer little harm from an injunction that prevents him from using or disclosing the misappropriated Greenlight Trade Secrets, or from working for a direct competitor whose central product is also a parent-managed payment card for kids and teens.   Greenlight only seeks to prevent Nichols from working in a very narrow section of the industry, and his skills are transferable to numerous other companies that do not directly compete with Greenlight.   Accordingly, this factor weighs heavily in favor of granting temporary injunctive relief.

3.   ***There is substantial likelihood that Greenlight will prevail on the merits of this dispute.***

Greenlight is substantially likely to succeed on the merits of its claims for trade secret misappropriation because there is a substantial likelihood that Nichols is disclosing and/or will disclose and use Greenlight's confidential and proprietary information and trade secrets.   Such disclosure is in violation of the Georgia Trade Secrets Act.   As a result of Nichols' actions, Greenlight has suffered and will continue to suffer immediate and irreparable harm to its business. As set forth below, Greenlight is likely to succeed on the merits under the GTSA.

---

[4]   This information is gathered from Nichols' publicly available LinkedIn account.   *See* https://www.linkedin.com/in/jordansnichols/

### a.   Information disclosed to Nichols constituted trade secrets under the GTSA.

Under the GTSA, a trade secret is defined as:

information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:

> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (B)  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. §§ 10–1–761(4).

Here, Greenlight shared with Nichols confidential and proprietary trade secret information including, but not limited to: Greenlight's costs to acquire customers ("CAC"); Greenlight's conversion rates; Greenlight's upgrade rates; Greenlight's target audiences; Greenlight's optimization tactics; Greenlight's creative learnings including winning imagery and copy and value propositions and Greenlight's spend volume and performance over time; Greenlight's volume and CAC goal, as well as Greenlight's interpretation of performance; Greenlight's strategic priorities for the marketing team and marketing plans for the year, including in other channels; Greenlight's product roadmaps; Greenlight's partnership priorities; Greenlight's perspective on the competitive landscape, including Step; and Greenlight's marketing technology stack and performance metrics from other sources. (Verified Complaint, ¶ 22).

First, the Greenlight Trade Secrets – all of which are nonpublic – derive economic value from not being generally known or readily ascertainable by proper means.  Greenlight spent years and devoted millions of dollars to developing its marketing, operating and product plans by testing and researching what ultimately worked to reach consumers and to sell its product.  (*See Id.*, ¶ 37).

15

The Greenlight Trade Secrets are all core tenets of Greenlight's business which are extremely confidential and closely guarded by Greenlight.  (*See Id.*, ¶ 38).  Greenlight has very few competitors in the parent-managed payment cards for kids and teens space; however, should Greenlight's competitors acquire the Greenlight Trade Secrets, they would have unfair bargaining power and anti-competitive insight into Greenlight's business and would be able to essentially recreate Greenlight's business without expending the immense time and effort that Greenlight invested.  (*See Id.*, ¶ 39); *See Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1411 (11th Cir. 1998) (concluding that information qualified as trade secrets because it was demonstrated that it was closely guarded in the industry,  that a competitor could not easily derive the information through other means, and that a competitor could make use of such information to the detriment of the owner.)

Second, Greenlight takes reasonable measures to keep the Greenlight Trade Secrets secret by storing such information on a secure, password-protected computer network, and by making them available only to key employees such as executives and employees with a direct need-to-know regarding such information. (Verified Complaint, ¶ 45).  Moreover, Greenlight requires individuals who become privy to the Greenlight Trade Secrets to first sign a non-disclosure agreement prior to disclosure of non-public information, and additionally requires employees to execute non-disclosure agreements, confidentiality agreements, and, for certain senior executives, restrictive covenant agreements.  (*See Id.*, ¶ 46).  Here, the Greenlight Trade Secrets were only shared with Nichols pursuant to the MNDA and in furtherance of his role as Greenlight's dedicated Facebook Client Partner.  Accordingly, the Greenlight Trade Secrets qualify as trade secrets under the GTSA.

**b. There is a substantial likelihood that Defendant has already used and will continue to use the Greenlight Trade Secrets.**

The GTSA defines "misappropriation" as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or "disclosure or use of a trade secret of another without express or implied consent by a person who . . . "

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

O.C.G.A. § 10-1-761(2). The GTSA prohibits both "actual or threatened misappropriation" of trade secrets. O.C.G.A. § 10–1–762.

Here, Nichols acquired the Greenlight Trade Secrets under a duty to maintain their secrecy, subject to the MNDA. (Verified Complaint, ¶ 11). Furthermore, there is a substantial likelihood that Nichols has already used and/or disclosed and/or will disclose the Greenlight Trade Secrets to Step and use the Greenlight Trade Secrets to Step's advantage. In a senior position of "Leading Partnerships" at Step, and particularly since Step is an early-stage company, Nichols will

17

interact on a daily basis with Step's senior leaders and will be jointly accountable for growing Step.  (*See Id.*, ¶ 11).  It is beyond dispute that Nichols is privy to many of Greenlight's most closely held trade secrets, including, but not limited to, the success of Greenlight's specific product and feature offerings; Greenlight's most successful marketing strategies, including Greenlight's creative images, target audiences, ad settings images and messages, and registration flows; Greenlight's target audiences, optimization tactics and creative learnings; and Greenlight's prioritization of partnership opportunities and of partnerships relative to other growth channels. (*See Id., ¶¶* 32-36).  His knowledge of the Greenlight Trade Secrets, disclosed to him subject to the MNDA, has essentially provided Nichols a roadmap for how to model many of Step's business strategies identically after Greenlight without expending the years and millions of dollars that Greenlight invested. (*See Id.*, ¶ 39).  Indeed, even if Nichols is forbidden from further disclosing the Greenlight Trade Secrets to Step, it will be nearly impossible for Nichols not to use such information for Step's benefit by, for example, using his knowledge about Greenlight's marketing strategies and channels to identically model Step's marketing efforts, and to inform Step's decision making regarding what products and features to build, and how to prioritize partnerships and other growth opportunities.

Based on the foregoing, the Greenlight Trade Secrets constitute trade secrets and there is a substantial likelihood that Nichols has already used and/or disclosed and/or will use and disclose the Greenlight Trade Secrets during his employment with Step, a direct competitor of Greenlight. Thus, Greenlight seeks immediate injunctive relief preventing Nichols from working for Step or any other direct competitors of Greenlight that provide parent-managed payment cards for kids and teens, and preventing Nichols from using or disclosing the misappropriated Greenlight Trade Secrets.

   *4.* ***Granting the injunction against Nichols will not disserve the public interest.***

   In no way will the public be disserved if the injunction issues. It is in the public interest to restrain anti-competitive behavior made possible by the theft of trade secret information. *See also Priority Payment Sys., LLC v. Signapay, LTD*, 161 F. Supp. 3d 1294, 1304 (N.D. Ga. 2016) ("There is a strong public policy for protecting trade secrets from misappropriation and in promoting fair competition."). A contrary ruling would embolden would-be misappropriators seeking competitive advantage over rival businesses.

   *5.* ***Greenlight has no adequate remedy at law.***

   When courts consider whether there is an adequate remedy at law, the remedy at law must be "as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity." *See Concrete Coring Contractors, Inc. v. Mech. Contractors & Engineers, Inc.*, 220 Ga. 714, 718-19 (1965). Here, the results caused and likely to be caused by Nichols' actions cannot be compensated with damages alone. Greenlight's technology is a one-of-a-kind product in the financial technology industry and Greenlight has spent countless hours developing its product and business model.  (Verified Complaint, ¶ 37).   Nichols has gathered sufficient proprietary information from Greenlight to essentially re-create Greenlight's business model and successful marketing efforts at Step, a direct competitor of Greenlight, without any of the expenditure, time or effort that Greenlight expended, which is irreparably harmful to Greenlight.  (*See Id.*, ¶ 39). This immediate and irreparable harm justifies injunctive relief in favor of Greenlight.

## CONCLUSION

   This Court should grant Greenlight's motion for a temporary restraining order and for a preliminary injunction because (1) Greenlight has a substantial likelihood of success on the merits; (2) failure to enjoin Nichols' behavior during the pendency of this litigation would result in

immediate and irreparable harm to Greenlight's continued business operations; (3) the balance of equities favors injunctive relief; and (4) the public interest cuts in favor of Greenlight's requested relief.  Accordingly, Greenlight respectfully requests that this Court enter a temporary restraining order and a preliminary injunction preventing Nichols from using or disclosing the Greenlight Trade Secrets or any information derived therefrom, and from working for Step or any other direct competitor of Greenlight whose central product is also a parent-managed payment card for kids and teens, during the pendency of this litigation.

Respectfully submitted this 4th day of June 2021.

*/s/ Jeffrey L. Mapen*
Jeffrey L. Mapen
Georgia Bar No. 469936
E-mail:  jeff.mapen@nelsonmullins.com
Jessica R. Watson
Georgia Bar No. 760076
E-mail: jessica.watson@nelsonmullins.com
*Attorneys for Plaintiff Greenlight Financial Technology, Inc.*

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street/ 17th Floor
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day, I served the within and foregoing *Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support* by electronic mail and U.S. Mail to the following:

Jordan Nichols
90 Lincoln Drive
Sausalito, CA 94965
E-Mail: jordan.nichols44@gmail.com

Respectfully submitted this 4th day of June 2021.

/s/ Jeffrey L. Mapen
Jeffrey L. Mapen
Georgia Bar No. 469936
E-mail:  jeff.mapen@nelsonmullins.com
Jessica R. Watson
Georgia Bar No. 760076
E-mail: jessica.watson@nelsonmullins.com
*Attorneys for Plaintiff Greenlight Financial Technology, Inc.*

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street/ 17th Floor
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)



**EXHIBIT**
**A**

| | |
|---|---|
| **From:** | Jeff Mapen |
| **Sent:** | Thursday, June 3, 2021 3:14 PM |
| **To:** | jordan.nichols44@gmail.com |
| **Cc:** | Jessica Watson; Michelle Johnson |
| **Subject:** | Greenlight v. Nichols - Fulton County Superior Court (Georgia) |
| **Attachments:** | 2021.06.03 - Greenlight - Civil Filing Form, Complaint, and Summons.pdf |

Good afternoon, Mr. Nichols – we never heard back from you in response to my May 28 letter.  Attached is a copy of a lawsuit filed today on behalf of Greenlight against you in the Superior Court of Fulton County, Georgia.  To the extent you have retained an attorney, please forward this email to them and have your counsel contact me at their earliest opportunity.  In the interim, we expect to request a temporary restraining order from the Court and will provide as much notice to you as possible.

Thanks.

Jeff Mapen



**NELSON MULLINS**

**JEFFREY L. MAPEN**  PARTNER
jeff.mapen@nelsonmullins.com
**ATLANTIC STATION | SUITE 1700**
**201 17TH STREET NW | ATLANTA, GA 30363**
T 404.322.6157   F 404.322.6276
NELSONMULLINS.COM   VCARD  VIEW BIO

Fulton County Superior Court
***EFILED***TB
Date: 6/8/2021 11:09 AM
Cathelene Robinson, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| GREENLIGHT FINANCIAL TECHNOLOGY, INC., | ) ) ) | |
| Plaintiff, | ) ) | CASE NO. 2021CV350274 |
| v. | ) ) | JURY TRIAL DEMANDED |
| JORDAN NICHOLS, | ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFF'S MOTION TO APPOINT SPECIAL PROCESS SERVER

COMES NOW the Plaintiff, Greenlight Financial Technology, Inc. by and through its undersigned counsel, hereby moves this Court for the appointment of a special process server to serve the above-named Defendant, Jordan Nichols, with a copy of the Summons and Complaint for Injunctive Relief and Damages in this action and show in support thereof the following:

1.

In accordance with O.C.G.A § 9-11-4(c), process may be served by the Sheriff of the County where the action is brought or where the Defendant is found or by any citizen of the United States specially appointed by the Court for that purpose.

2.

Plaintiff requests and moves this Court to appoint Shalonda Tillman as special process server who will serve a filed copy of the within action and Summons upon the above-named Defendant, Jordan Nichols.

3.

The appointment of a special process server is to the benefit and best interest of justice to effectuate service of process upon the above-named Defendant, Jordan Nichols.

WHEREFORE, Plaintiff prays and moves this Court to grant its motion and appoint Shalonda Tillman as a special process server to serve the above-named Defendant, Jordan Nichols.

Respectfully submitted this 8th day of June 2021.

/s/ Jeffrey L. Mapen
Jeffrey L. Mapen
Georgia Bar No. 469936
E-mail:  jeff.mapen@nelsonmullins.com
Jessica R. Watson
Georgia Bar No. 760076
E-mail: jessica.watson@nelsonmullins.com
*Attorneys for Plaintiff Greenlight Financial Technology, Inc.*

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street/ 17th Floor
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

GREENLIGHT FINANCIAL          )
TECHNOLOGY, INC.,             )
                             )
    Plaintiff,          )
                             )          CASE NO. 2021CV350274
v.                           )
                             )          JURY TRIAL DEMANDED
JORDAN NICHOLS,              )
                             )
    Defendant.          )
                             )
_____      )

## CERTIFICATE OF SERVICE

    I hereby certify that on this day, I served the within and foregoing **Plaintiff's Motion to**

**Appoint Special Process Server** by electronic mail and United States mail to:

Jordan Nichols
90 Lincoln Drive
Sausalito, CA 94965
Email: Jordan.nichols44@gmail.com

Respectfully submitted this 8th day of June 2021.

                        */s/ Jeffrey L. Mapen*
                        Jeffrey L. Mapen
                        Georgia Bar No. 469936
                        E-mail:  jeff.mapen@nelsonmullins.com
                        Jessica R. Watson
                        Georgia Bar No. 760076
                        E-mail: jessica.watson@nelsonmullins.com
                        *Attorneys for Plaintiff Greenlight Financial Technology,*
                        *Inc.*

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street/ 17th Floor
Atlanta, GA  30363
(404) 322-6000 (phone)

(404) 322-6050 (fax)

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| GREENLIGHT FINANCIAL TECHNOLOGY, INC., | ) ) ) | |
| Plaintiff, | ) ) | CASE NO. 2021CV350274 |
| v. | ) ) | JURY TRIAL DEMANDED |
| JORDAN NICHOLS, | ) ) | |
| Defendant. | ) ) ) | |

**ORDER GRANTING MOTION FOR**
**APPOINTMENT OF SPECIAL PROCESS SERVER**

Upon consideration of Plaintiff's Motion for Appoint of a Special Process Server, and in consideration of applicable law;

IT IS HEREBY ORDERED that Shalonda Tillman is specially appointed for service of the within action and Summons upon the above-named Defendant, Jordan Nichols.

So ORDERED this _____ day of _____ 2021.


_____
JUDGE KELLY LEE ELLERBE
Superior Court of Fulton County

Fulton County Superior Court
***EFILED***QW
Date: 6/10/2021 1:12 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

GREENLIGHT FINANCIAL                  )
TECHNOLOGY, INC.,                     )
                                      )
    Plaintiff,                    )
                                      )          CASE NO. 2021CV350274
v.                                    )
                                      )
JORDAN NICHOLS,                       )
                                      )
    Defendant.                    )
_____    )

## **INTERLOCUTORY INJUNCTION**

This matter is before the Court on Plaintiff Greenlight Financial Technology, Inc.'s ("Greenlight's") Motion for Temporary Restraining Order and Preliminary Injunction filed June 7, 2021 ("Motion"). After considering the Motion and Verified Complaint for Temporary Restraining Order, Injunctive Relief and Damages filed June 3, 2021 (the "Verified Complaint"), and holding a hearing on June 9, 2021, at which Greenlight attended and Defendant did not, the Court hereby enters the following Order.

## 1.1    STANDARD OF REVIEW

According to the Georgia Supreme Court, in deciding whether to issue an interlocutory injunction, a trial court should consider whether

'(1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened

injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.'

TMX Fin. Holdings, Inc. v. Drummond Fin. Servs., LLC, 300 Ga. 835, 836 (2017) (citation omitted). Further, "[a]lthough one seeking interlocutory injunctive relief need not always prove all four of these factors, a trial court must keep in mind that an interlocutory injunction is an extraordinary remedy, and the power to grant it must be prudently and cautiously exercised." Id. at 836 (citation omitted).

## 2. FINDINGS OF FACT AND CONCLUSIONS OF LAW

First, the Court finds Greenlight provided Defendant with notice of the hearing, and Defendant demonstrated that he received actual notice of the hearing by exchanging communications with the Court and Greenlight's counsel regarding the same. Notably, there is no requirement of personal service prior to the issuance of either a temporary restraining order or an interlocutory injunction; rather, notice to the adverse party is all that is required by O.C.G.A. § 9-11-65(a). See also Focus Entm't Int'l, Inc. v. Partridge Greene, Inc., 253 Ga. App. 121, 124 (2001) ("service of process is not necessary for either a TRO or interlocutory injunction hearing, only notice.").

Second, having considered the Motion, the supporting brief, the Verified Complaint, the arguments of counsel, and the entire record, the Court finds

Greenlight has made an appropriate showing to entitle Greenlight to a temporary restraining order and an interlocutory injunction in accordance with O.C.G.A. § 9-11-65. Greenlight has demonstrated that immediate and irreparable injury will ensue should emergency relief not be provided under O.C.G.A. § 9-11-65. Furthermore, the Court finds that an interlocutory injunction is appropriate, as Greenlight has demonstrated that: (1) there is a substantial threat that Greenlight will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to Greenlight outweighs the threatened harm that the injunction may do to Defendant; (3) there is a substantial likelihood that Greenlight will prevail on the merits of its claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.

**IT IS THEREFORE ORDERED** as follows:

(a) Pending final resolution of this matter at trial or other Order of this Court, Defendant shall not work for Step Mobile, Inc. or any other direct competitor of Greenlight that provides parent-managed payment cards for kids/teens;

(b) Pending final resolution of this matter at trial or other Order of this Court, Defendant shall not use or disclose the Greenlight Trade Secrets, which includes:

    a. Greenlight's costs to acquire customers ("CAC");
    b. Greenlight's conversion rates;

    c.  Greenlight's upgrade rates;

    d.  Greenlight's target audiences;

    e.  Greenlight's optimization tactics;

    f.  Greenlight's creative learnings including winning imagery and copy and value propositions and Greenlight's spend volume and performance over time;

    g.  Greenlight's volume and CAC goals, as well as Greenlight's interpretation of performance;

    h.  Greenlight's strategic priorities for the marketing team and marketing plans for the year, including in other channels;

    i.  Greenlight's product roadmap;

    j.  Greenlight's partnership priorities;

    k.  Greenlight's perspective on the competitive landscape, including Step, an early-stage financial technology company that is a direct competitor of Greenlight; and

    l.  Greenlight's marketing technology stack and performance metrics from other sources.

Greenlight is **ORDERED** to serve Defendant with a copy of this Order.

**SO ORDERED**, this *10th* day of June, 2021.

_____
Honorable Kelly Lee Ellerbe
Judge, Superior Court of Fulton County

**Service via eFileGA.**

*SUBMITTED BY (and edited by the Court):*

Jeffrey L. Mapen
Georgia Bar No. 469936
E-mail: jeff.mapen@nelsonmullins.com
Jessica R. Watson
Georgia Bar No. 760076
E-mail: jessica.watson@nelsonmullins.com
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street/ 17th Floor
Atlanta, GA 30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

GREENLIGHT FINANCIAL                )
TECHNOLOGY, INC.,                        )
                                                      )
    Plaintiff,                           )
                                                      )    CASE NO. 2021CV350274
v.                                                    )
                                                      )    JURY TRIAL DEMANDED
JORDAN NICHOLS,                        )
                                                      )
    Defendant.                         )
                                                      )
_____)

## **CERTIFICATE OF SERVICE**

I hereby certify that on Friday, June 11, 2021, a copy of the Order on Interlocutory

Injunction was sent by electronic mail and FedEx Express Mail to:

Jordan Nichols
6301 Shellmound Street, Apt 508
Emeryville, California 94608
Email: Jordan.nichols44@gmail.com

Respectfully submitted this 11th day of June 2021.

/s/ Jeffrey L. Mapen
Jeffrey L. Mapen
Georgia Bar No. 469936
E-mail:  jeff.mapen@nelsonmullins.com
Jessica R. Watson
Georgia Bar No. 760076
E-mail: jessica.watson@nelsonmullins.com
*Attorneys for Plaintiff Greenlight Financial Technology,*
*Inc.*

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street/ 17th Floor
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)